UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

VAĒSO, INC. )
)
          *Plaintiff,* )
)
vs. ) Cause No.
)
HIGH PEAK SOFTWARE, INC. ) **AFFIDAVIT**
)
          *Defendant.* )

**JOSE SUAREZ**, being duly sworn, deposes and says:

1. I am the Chief Executive Officer of Vaēso, Inc., a company maintaining a principal place of business in Hollywood, Florida.

2. Defendant High Peak Software, Inc. ("HPS") is a company maintaining a principal place of business in Atlanta, Georgia.

3. I am familiar with the facts and circumstances set forth herein.

4. I submit this affidavit with the emergency request that this Court maintain the status quo between the parties and prevent HPS from sharing or selling Vaēso's confidential information.

5. Confidentiality has been defined between the parties pursuant to the terms of a Master Services Agreement, dated August 1, 2018, **Exhibit 1**[1].

"12   **CONFIDENTIALITY**
Information exchanged under this Agreement will be treated as confidential if identified as such at disclosure or if the circumstances of disclosure would reasonably indicate such treatment. Notwithstanding any failure to so identify or mark it as such, the following categories of Customer's information shall automatically be deemed to be confidential information: b) discoveries, novel ideas (including, without limitation, ideas relating to new products, new services, or new methods of doing business), developments, designs, improvements, inventions, blueprints, structures, software, systems, content, processes (including technical and business processes), procedures (including technical and business procedures), methods, manuals, computer programs, know-how, data, techniques, formulas, marketing and business plans and outlines, strategies, budgets, forecasts, projections, unpublished financial statements, costs, fee schedules, client and supplier lists, client and prospective client databases, access codes and similar security information and procedures,

---

[1] That Agreement was amended by later Agreement dated September 24, 2020, **Exhibit 2**.



and all patents, copyrights, mask works, trade secrets, and other proprietary rights thereto; c) data regarding Customer's and its affiliates' suppliers, vendors, employees, investigators, developers, researchers, investors and business partners; d) Customer's and its affiliates' costs, expenses, financial position, prices, possible revenues and profit margins; and e) other processes, systems, software, hardware, designs, plans, strategies and configurations Customer or its affiliates' use or plan to use to conduct its business. Confidential information may only be used for the purpose of fulfilling obligations or exercising rights under this Agreement, and shared with employees, agents or contractors with a need to know such information to support that purpose. Confidential information will be protected using a reasonable degree of care to prevent unauthorized use or disclosure for five (5) years from the date of receipt or (if longer) for such period as the information remains confidential. These obligations do not cover information that:

> I. is or becomes available to the public through no fault of the receiving party;
> II. was known or becomes known to the receiving party without obligation of confidentiality;
> III. is rightfully received by the receiving party from a third party without a duty of confidentiality;
> IV. is independently developed by the receiving party without reference to the confidential information of the disclosing party; or
> V. where disclosure is required by law or a governmental agency.

For the avoidance of doubt, under no circumstances may Provider:
x) disclose Customer's confidential information (including any Deliverables) to a competitor of Customer (as defined in Section 10.2(f) above) or y) disclose or provide access to Customer's confidential information (including any Deliverables) to any client or potential client of Provider, or to any employee or contractor of Provider not directly involved in the development of Deliverables for Customer."

6. Some additional background for the instant motion is needed.

7. In the stated Augst 1, 2018 contract, Vaëso agreed on "Exhibit B" hourly rates to be charged by HPS based on the role and seniority of the employees to be provided by HPS to Vaëso for the development of the Vaëso software platform. ~~which were a part of~~ **Exhibit 1**.

8. On August 17, 2018 HPS provided Vaëso a Scope of Work delineating the completion of an Alpha version of the Vaëso software platform within a maximum of 22 weeks. Posteriorly, January 31, 2019 was the agreed upon date of said Alpha version of the Vaëso software platform.

9. In February 2019 due to the woeful delay in delivering the Alpha version at the end of January 2019, Vaëso began a conversation with HPS leadership to change the terms of the original end-to-end software service provider agreement to that of a build-to-operate agreement whereby Vaëso would

pay a cost-to-company rate (CTC – i.e., gross employee salary plus the corresponding labor taxes) to HPS instead of the aforementioned much higher Exhibit B rates.

10. Vaëso provided such an option to HPS as the ever increasing penalties (every day and week of delay, the % discount to be provided by HPS to Vaëso for such delays was ratcheting higher and higher) defined in the signed contract between the parties for the almost four (4) months in delays incurred by HPS (the alpha scope of work product was not provided by HPS to Vaëso until past mid-Q2 2019).

11. Thus, in April 2019, Vaëso presented a new agreement to HPS whereby Vaëso would pay HPS at a "cost to company" rate ("CTC") and in exchange provide 75,000 warrants to be earned equally for six (6) semesters based on simple to calculate and objective software delivery quality and timeliness metrics.

12. Vaëso defined such "earn-out" metrics as from the previous eight (8) months of poor performance, Vaëso had little confidence that HPS could deliver on its promises.

13. At that point in time, in a voice conversation between I and HPS owner Mr. Vinay Chandra, I asked him given the fact that we were soon going to increase the HPS team size supporting Vaeso to +50 (out of a total HPS payroll of approximately 100 employees), what percentage markup would he consider reasonable for HPS to earn given the size and importance of our account relative to the size of his entire company. Mr. Chandra answered, "20%". I then proceeded to use said 20% markup (i.e., if an employee's cost was $1000, Vinay accepted that $1200 was a reasonable rate for HPS to charge Vaëso for that employee) to calculate the number of warrants we would have to pay him during the next three (3) years of service based on the CTC cost of the current and future larger HPS team that was and would be providing services to Vaëso.

14. This is the methodical calculation that was provided to Mr. Vinay Chandra and was used to arrive at the fair and equitable sum of 75,000 warrants.

15. On August 22, 2019, Mr. Chandra sent an email to me accepting the CTC rates and 75,000 shares but in said email he balked at the now revised six (6) semester 75,000 warrant performance clause (the quality and delivery time metrics were changed to a quality and employee turnover rate) as he said,

"quality is within our control. However the excessive turnover clause is a tough one to hold as we do not have a lot of control on this due to present market conditions".

16. Vaēso did not accept his request to annul such metrics as a means for HPS to earn the 12,500 warrants per semester over a six (6) semester period (i.e., a total of 75,000 warrants over the three-year period) as Vaēso had not seen any ability on the part of HPS to correct its lack of accountability, responsibility and/or discipline to achieve any of the promises given to Vaēso during the previous one (1) year of work.

17. Due to the shift in rates from Exhibit B rates to CTC rates, Vaēso and HPS agreed to cancel all previously remitted invoices (i.e., the eight months that we invoiced at the much higher Exhibit B rates encompassing the period of Aug 2018 to Mar 2019) and thus Vaēso and HPS agreed to use the price differential previously paid by Vaēso to HPS during the stated eight month time period (i.e., the difference between Exhibit B rates minus CTC rates during said eight month period), to effectively cancel the balances of all the re-issued new CTC invoices for the period Aug-2018 to Mar-2019, plus the CTC service invoices emitted by HPS for the periods Apr-2019, May-2019, Jun-2019 and Jul-2019. Because of said cancellation of past invoices and their re-issue at a much lower value minus all the payments made by Vaēso to that date, at the end of July 2019 Vaēso only owed HPS a balance of US$41,000 for all the months from Aug-2018 to Jul-219 (even though no payment had ever been made for the Apr-May-Jun-Jul 2019 CTC invoices); balance that was agreed to by Mr. Vinay Chandra of HPS in an email exchange on August 1, 2019 with Vaēso's Financial Director. Said balance of $41,000 balance to close the entire period from Aug-2018 to Jul-2019 was duly paid immediately by Vaēso.

18. In the meantime, HPS was not living up to its end of the bargain. Vaēso shortly thereafter and for the entire period from Sep-2019 until May-2021 (moment at which Vaēso in desperation decided to take the drastic decision to directly manage the daily development of Vaēso's software including not only the end-to-end daily management of its own Vaēso employees plus also those of the HPS team being provided by HPS to Vaēso) sent numerous emails over the mentioned twenty-two (22) months complaining to HPS about:

a. HPS's lack of knowledge of building processes and procedures to enable the industrialization (i.e., significant improvement inefficiency, effectiveness, timely delivery, quality as measured by number of bugs found and also ability for the timely hire of new talent) of the HPS Team allocated to Vaēso;

b. extensive and long delivery delays;

c. Unacceptable number of "bugs" (critical, road-blocker, major and minor) in each release;

d. Continuing number of unresolved bugs;

e. Inability of HPS to hire talent at the speed demanded by Vaēso

19. In February 2020, after Vaēso had spent six (6) months complaining to HPS for HPS's lack of development of the minimal:

- systems,
- processes,
- procedures,
- planning,
- management of the +50 software development team
- delivery of a product that was bug free (virtually all major HPS software releases were riddle with hundreds of bugs, a performance significantly worse than the industry norm)
- conformance to previously agreed upon release dates

Vaēso requested that HPS emit a 100% credit note for three months of services as a means to assuage the dysfunctional performance of the HPS provided team.

20. At the end of March 2020, HPS agreed to such a three-month credit as it could not dissimulate its poor performance emitting a credit note to Vaēso on March 31, 2020 for the sum of $46,354, a further one on August 24, 2020 for $40,291 and agreeing to emit the third credit note for a full month of its fees in the month when Vaēso's software platform were to be installed in a tenth factory (fact that occurred in December 2020 but for which HPS has still not emitted a credit note equal to $56,264; amount thus that HPS still owes Vaēso).

21. In July, 2020, given that HPS had accepted said three (month) penalty, Vaēso sent a new proposal to HPS whereby it would give 76,506 warrants with immediate vesting on July 1, 2020 and a further

75,000 warrants to be earned in vesting every semester for six semesters thereafter if HPS could hire in a timely fashion the required growing staffing need of Vaēso.

22. The foregoing was contingent on HPS's ability to hire required new team members based on Vaēso's written hiring requirements.

23. At the time, the 76,506 warrants were valued at $137,710.

24. In October 28, 2020, HPS redlines the contract previously sent by Vaēso.

25. Over the next twelve (12) months, the parties exchanged and discussed the proposed agreement continued working based upon the CTC rates with Vaēso making monthly payments.

26. In September 2021, Vaēso sent an email to HPS stating that it would like to discuss the termination of the relationship, exercising the transfer of the existing HPS Team allocated to Vaēso.

27. HPS responded by letter dated November 1, 2021 stating that there was a balance of $318,396 due and owing.

28. HPS then invoked Section 18 of the agreement (**Exhibit 1**) to discuss good faith resolution.

29. Vaēso responded by providing an accounting of those facts for the period Aug 1, 2018 until October 31, 2021 demonstrating that Vaēso did not owe HPS any outstanding invoices.

30. By email dated November 12, 2021, HPS advised Vaēso that because it viewed there to be a balance, it was claiming ownership of all Developed Property – meaning Vaēso's confidential information.

31. In November and December, 2021, Vaēso and HPS had several calls to try to resolve their differences.

32. The next communication was from HPS' counsel dated January 14, 2022.

33. At best there is a financial dispute between the parties.

34. The same cannot act as a basis for HPS to take Vaēso's confidential information and use it as its own.

35. Once shared, Vaēso's confidential information cannot be recovered and Vaēso will be irreparably damaged.

36. The foregoing notwithstanding, the Defendant been threatening to convert our property and now has taken affirmative steps in furtherance of the same.

37. I am advised that Madhu Seshadri, a current HPS employee and former worker on the Vaēso project on behalf of HPS who was terminated for his incompetence, called Mamatha Naganna asking her to

give him a "grooming session" (i.e. a verbal explanation of the product module-features developed since his removal from the Vaëso project in August 2021).

38. This contact highlights to us that HPS is beginning to think how to monetize our +850,000 lines of code that have been co-developed by employees provided by HPS to Vaëso but also by Vaëso's own employees (since August 2018, date when Vaëso started the development of its software platform) expressly violating the terms of the agreement between the parties.

39. To demonstrate the bad-faith conduct of HPS, and the reason for this emergency request, under Section 12 of the Master Services Agreement (**Exhibit 1**), the same reads:

> "For the avoidance of doubt, under no circumstances may Provider:
> x) disclose Customer's confidential information (including any Deliverables) to a competitor of Customer (as defined in Section 10.2(f) above) or
> y) disclose or provide access to Customer's confidential information (including any Deliverables) to any client or potential client of Provider, or to any employee or contractor of Provider not directly involved in the development of Deliverables for Customer."

40. I urge this Court to grant this application, to help maintain the status quo and to protect the confidential information of Vaëso.

41. As of the filing of this Order to Show Cause, we have simultaneously commenced an action sounding in breach of contract against HPS.

42. No prior application for the foregoing relief has been sought in this matter.

STATE OF FLORIDA
COUNTY - Miami Dade

_____
JOSE SUAREZ

Sworn to before me this 13 Day of February, 2022.

_____
Notary Public



GERARDINE PIERRE
Notary Public-State of Florida
Commission # GG 305454
My Commission Expires
February 25, 2023