EXHIBIT

Pltf Ex 1

exhibitsticker.com

# MASTER SERVICES AGREEMENT

This Master Services Agreement is made effective as of August 1, 2018 (the "Effective Date") by and between Impactiva S. de R.L. a limited liability company organized under the laws of the Republic of Panama ("Customer"), and High Peak Software, Inc., a Delaware corporation ("Provider").

## RECITALS

A.   Provider is in the business of providing offshore software development and testing services performed by personnel in India, currently from offices at High Peak Software Pvt. Ltd, No. 4, 17th Cross, Banashankari 2nd Stage, Bangalore – 560070, India.

B.   Customer desires to retain Provider to perform such services as specified in each Statement of Work defined below, and Provider desires to provide such services to Customer, in accordance with the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Provider and Customer hereby agree as follows:

## 1    DEFINITIONS

1.1   "Agreement" shall mean this Master Services Agreement and all exhibits attached hereto, together with all Statements of Work executed hereunder and all exhibits, schedules, and appendices attached thereto.

1.2   "Deliverables" shall mean all items described in a Statement of Work to be delivered to Customer by Provider pursuant to such Statement of Work.

1.3   "Project" shall mean the project for Services under each Statement of Work.  Each Project will involve end-to-end (back-end, design of user experience – user interphase, front end) software development with both automated and manual testing and debugging.  Software must be scalable (to millions of users) and flexible to accommodate future functionality and additions of business objects to the database.

1.4   "Services" shall mean all services (including without limitation all Deliverables) described in a Statement of Work to be performed by Provider pursuant to such Statement of Work.

1.5   "Specification" shall mean Customer's written description of the functional and technical requirements, operations, and procedures for a given Deliverable or Project.

1.6   "Statement of Work" shall mean each mutually acceptable written statement of work for a Project that Customer and Provider enter into from time to time hereunder, each of which shall, when executed by both parties, form a part of this Agreement and become subject to the terms and conditions of this Agreement.  Each Statement of Work shall be based on the form attached hereto as <u>Exhibit A</u> and include at a minimum:

(a) a detailed description of the Services to be performed by Provider for the applicable Project;

(b) a list of all of milestones and Deliverables required of Provider for the applicable Project; and

(c) a description of all fees and payment terms for Services rendered under the Statement of Work; where not specified therein, such terms shall be as set forth in Section 8.



**2 SCOPE OF SERVICES**

2.1 <u>Statements of Work</u>.  Customer hereby agrees to retain Provider to perform the Services set forth in each mutually acceptable Statement of Work, and Provider hereby agrees to perform such Services for Customer, subject to the terms and conditions set forth in this Agreement.  A Statement of Work may provide for the provision of Services on a time and materials basis ("T&M Projects") or fixed price basis ("Fixed Price Projects") as agreed by the parties in such Statement of Work.  In the event of a conflict between this Master Services Agreement and a Statement of Work, the provisions of such Statement of Work shall prevail.

2.2 <u>Third-Party Components</u>.  Provider shall not include any third-party products or materials as part of any Deliverable ("Third-Party Components"), unless specified in the applicable Statement of Work for such Deliverable.  Except as the parties otherwise agree in the applicable Statement of Work, Customer will be responsible for obtaining appropriate license(s) for such Third-Party Components and for paying applicable license fees to the applicable third-party vendor.  Provider shall be responsible for providing reasonable assistance to Customer for securing all such licenses required from third parties for Customer's use of any such Third-Party Components.

2.3 <u>Change Orders</u>.  Either party may request a written change order ("Change Order") to the scope of Services specified in a Statement of Work in the event of material actual or anticipated change(s) to the agreed scope of Services as specified in such Statement of Work.  Either party may propose a Change Order reflecting the proposed changes for negotiation between the parties.  The parties agree to negotiate in good faith the timely resolution of all Change Order proposals.  No Change Order shall be binding on the parties unless it is agreed in writing (email to suffice) by the Customer Project Manager/Coordinator (or a higher-level management representative at Customer) and the Provider Project Manager (or a higher-level management representative at Provider).  No work will begin on changes until such signatures have been obtained.  Notwithstanding the above, neither party shall propose a Change Order based upon an estimate, project, staffing, or assumption error or omission based on a material error or omission that such party knew about with respect to the Services specified in the Statement of Work.  In the event of such an error or omission by Provider, Provider will allocate the resources necessary to meet the Project timeline and delivery requirements, at no additional charge to Customer, except to the extent that such error or omission was caused by Customer.

**3 MANAGEMENT**

3.1 <u>Relationship Management</u>.  Promptly after the Effective Date, Customer and Provider each will designate a management-level employee of such party (each a "Relationship Manager") to act as a primary point of contact for the other party under this Agreement and to manage all aspects of the relationship between the parties under this Agreement on behalf of such party.  Each party shall have the right to replace its Relationship Manager by providing notice of such replacement to the other party.

3.2 <u>Project Management; Reports</u>.  For each Project, Customer and Provider each will designate a management-level employee of such party in the applicable Statement of Work to act as the primary point of contact for the other party with respect to such Project (each a "Project Manager").  Such Project Managers will have the power to make technical and Project-level decisions (including, for example, staffing decisions and acceptance of Deliverables) that are binding on their respective entities.  Amendments to this Agreement, however, must be made in accordance with Section 19.5 below, and changes to a Statement of Work must be made in accordance with the Change Order process set forth in Section 2.3 above.  Provider agrees to submit written reports on the progress of the Services performed under each Statement of Work as may be reasonably requested by Customer's Project Manager from time to time.



**4  PROVIDER PROJECT TEAMS**

4.1  <u>Composition of Provider Teams</u>.  Provider shall consult with Customer regarding the size and composition of the Provider personnel for each Project ("Provider Team").  Provider Teams shall consist of regular employees of Provider ("Provider Representatives"), except as the parties may otherwise agree in a Statement of Work.

4.2  <u>Removal of Provider Representatives</u>.  Once a Provider Team is established for a Project, Provider shall use commercially reasonable efforts to ensure the continuity of Provider Representatives assigned to perform Services under such Project and shall keep removals to a minimum.  Notwithstanding anything to the contrary, Customer may require Provider to remove any Provider Representative from a Project if, after consultation with Provider, it reasonably determines that such removal is in Customer's interest.  Any such removal shall be effective upon prior written notice, except in the case of the Provider Representative's fraud or material breach of a Customer policy or procedure.  Provider shall assign a suitable replacement resource to the Project as soon as practicable, but in any event within one (1) week following such removal.  There shall be no additional charge to Customer for the time associated with training, orienting, or providing background information to any replacement Provider Personnel assigned by Provider for purposes of readying such personnel to provide Services, unless Customer and Provider otherwise agree to in writing.

4.3  <u>Location of Services</u>.  The Services will be performed by Provider at the location(s) set forth in Recital A except by prior written notice to Customer.  Unless a Statement of Work provides otherwise, Provider will be responsible to provide, at no additional charge to Customer, all office space, network infrastructure, one personal computer with appropriate operating system, and other facilities as reasonably necessary for the performance of Services at such location(s); provided, that Customer will be responsible to provide, at no additional charge to Provider, work space, network infrastructure, and reasonable access to its premises during normal business hours, for Services requested by Customer to be conducted at Customer's locations.  While at Customer facilities, all Provider Personnel shall observe and comply with Customer's work rules, policies and standards to the extent communicated to Provider.

**5  COMMUNICATION AND COORDINATION**

5.1  <u>Communication</u>.  Customer and Provider will communicate regarding the Projects in a manner that ensures the timely and accurate flow of technical, managerial, and other information between them.  Such communication and coordination may include periodic teleconferences, written status reports, and such other communications as the parties deem appropriate for the particular Project.

5.2  <u>Customer Cooperation</u>.  Customer will apply commercially reasonable efforts to cooperate with Provider in its performance of Services under this Agreement, including providing technical clarification to Provider from time to time as to its interpretation of the scope of Services of a Project if requested by Provider and providing the following at its discretion (collectively, the "Customer Inputs"):

(a) such information to Provider as specified in a Statement of Work;

(b) such additional information, materials, and actions reasonably necessary for a given Project, which may include without limitation Customer data, designs, diagrams, programs, and Specifications, and

(c) such software and other technologies that Customer desires to have Provider test pursuant to this Agreement.



**6     REVIEW AND ACCEPTANCE OF DELIVERABLES**

6.1     <u>Review and Testing of Deliverables</u>.  Following Provider's delivery of each Deliverable to Customer, Customer will review and, if appropriate, test such Deliverable to determine whether it conforms to its corresponding Specifications under the applicable Statement of Work, and to otherwise determine whether the Deliverable meets the acceptance criteria specified in the applicable Statement of Work or, if no such acceptance criteria exist, then Customer's reasonable satisfaction with the Deliverable. Customer will perform its review and testing of each Deliverable, and communicate conformity, or lack thereof, within fifteen (15) days following the date on which Provider provides Customer with the Deliverable and notifies Customer that the Deliverable is ready for such review and testing.

6.2     <u>Revision of Deliverables</u>.  If Customer reasonably determines that a Deliverable fails to (a) conform to its corresponding Specifications under the applicable Statement of Work, or (b) meet the acceptance criteria specified in the applicable Statement of Work (or Customer's reasonable satisfaction if no such acceptance criteria exists), then Customer will submit a written statement to the Provider Project Manager specifying such non-conformities in reasonable detail.  In the event Customer issues such a notice, Provider shall, at no additional cost to Customer, promptly correct all specified non-conformities and resubmit the Deliverable for additional review and testing by Customer under the procedures set forth in Section 6.1 above.  If, within twenty one (21), then Customer may at any time thereafter, at its option, and without further obligation or liability of any kind, terminate the Statement of Work involved with no further obligation to make any payments thereunder.

6.3     <u>Acceptance of Deliverables</u>.   A Deliverable will be deemed to be fully and finally accepted by Customer upon:

    (a) Customer's written acceptance of the Deliverable, or

    (b) upon the expiration of fifteen (15) days following the date on which Provider provides Customer with the Deliverable and notifies Customer that the Deliverable is ready for such review and testing.

**7     FEES AND EXPENSES**

7.1     <u>General Billing Rates</u>.  For all Projects, all fees and other compensation and timing of payment will be set forth in the Statement of Work.  Except as the parties otherwise agree to in writing in the Statement of Work:

    (a) Provider shall perform T&M Projects under the billing rates set forth in the attached Exhibit B, and invoice T&M Projects on a monthly basis in arrears; and

    (b) if the billing methodology is not specified in a given Statement of Work, then the Project under such Statement of Work shall be a T&M Project.

Provider may reasonably change the billing rates set forth in the attached <u>Exhibit B</u> on an annual basis on January 1st of each year starting in the year 2021 by a maximum year-over-year increment of 3% for each rate, providing Customer with written notice of each such change prior to the beginning of the annual period for which change is effective, provided that no such change shall apply to any Statement of Work entered into prior to the effective date of the change.  In the absence of such a change, the then-stated rates in this Agreement shall continue.

With respect to any Statement of Work where Provider does not complete all required Deliverables on time, Provider shall be entitled to liquidated damages of fifteen percent (18%) of the total compensation due under such Statement of Work for the first thirty (30) days (or portion thereof) of delay, and four point five percent (4.5%) of the total compensation due under such Statement of Work for each of every further week of (or portion thereof) of delay.  Liquidated damages will be accrued and reflected as a credit, which may be applied by Customer against any outstanding invoices it has not yet paid to Provider.  Where no such outstanding invoices exist (or where only part of the credit

4



can be covered by any outstanding invoices), Provider shall promptly refund within a maximum of five (5) business days to Customer any remaining credit balance via a SWIFT wire transfer to Customer's account.

7.2  <u>Expenses</u>.  In addition to the charges for Services, Customer will reimburse Provider for reasonable out-of-pocket expenses required and actually incurred in the performance of the Services under a Statement of Work, including reasonable travel (coach class only), lodging, and required third party software or hardware; provided, however, that Provider:

   (a) obtains Customer's prior written approval of such expenses by the Customer Project Manager (or a higher-level management representative at Customer);

   (b) details such expenses on a form reasonably acceptable to both parties and submits related receipts; and

   (c) complies with Customer's then-current corporate travel policy for all travel related to a Project.

7.3  <u>Taxes</u>.  The fees chargeable by Provider are inclusive of all taxes.  Provider shall be liable and will pay for all taxes levied against or upon the Services provided hereunder including all employee-related taxes concerning Provider Personnel and corporate taxes based on Provider's income or authority to do business.

## 8  PAYMENT OF INVOICES

8.1  <u>Invoice Procedure</u>.  Unless other payment terms are specified in the applicable Statement of Work, Provider shall invoice Customer as follows:

   a) upon Customer's written acceptance of any Deliverables/milestones or work performed on a fixed-price basis; or

   b) monthly in arrears, for services provided on a time and materials basis and for out-of-pocket expenses.

Provider shall send a detailed invoice indicating the resources utilized on the Project and the charges for each such resource for the period covered by the invoice.  At Customer's request, Provider will supply Customer with Provider timesheets indicating hours worked by each Provider resource.  All fees under this Agreement shall be quoted, invoiced, and paid in United States dollars.

8.2  <u>Payment Terms</u>.  Unless other payment terms are specified in the applicable Statement of Work, Customer will pay undisputed invoices within thirty (30) days after its receipt of the applicable invoice.

8.3  <u>Disputed Invoices</u>.  Notwithstanding anything to the contrary, Customer may withhold payment on any portion of an invoice that Customer disputes in good faith.  If Customer disputes any portion of an invoice, the parties shall make every reasonable effort to settle promptly the dispute concerning the invoice in question in accordance with the dispute resolution procedures set forth in Section 18 below.

## 9  INTELLECTUAL PROPERTY

9.1  <u>Preexisting Property</u>.  Each party owns, and will continue to own, all right, title, and interests in and to any and all inventions however embodied, know how, works in any media, software, information, trade secrets, materials, property or proprietary interest that it owned prior to the Effective Date, or that it created or acquired completely independent of its obligations pursuant to this Agreement (collectively, "Preexisting Property").  All rights in Preexisting Works not expressly transferred or licensed herein are reserved to the owner.  Provider agrees that, except as may be expressly agreed in a Statement of Work, Provider shall not incorporate or embed any Provider Preexisting Property in



any Developed Property (as defined in Section 9.2 below). However, to the extent any Provider Preexisting Property or a portion thereof is incorporated or contained in any Developed Property for any reason, and subject to the payment by Customer of all amounts owed to Provider under this Agreement, Provider hereby grants to Customer a non-exclusive, perpetual, irrevocable, worldwide, fully paid-up, royalty-free license, with the right to sublicense and distribution directly or through its distribution channels, to use, copy, install, perform, display, modify, and create derivative works of any such Preexisting Property for Customer's business purposes and for the business purposes of its affiliates, distributors, customers, successors, and assigns.

9.2   <u>Developed Property</u>.  The parties agree that, subject to the payment by Customer of all amounts owed to Provider therefor, and except as otherwise set forth in Section 9.3 below, the following property (collectively, the "Developed Property") shall be the sole and exclusive property of Customer and will be promptly delivered to Customer upon its request:

    a)  any and all inventions however embodied, know how, works in any media, software (in all forms of code), information, trade secrets, materials, Deliverables, and any other work product or work of authorship of any kind that Provider makes, develops or reduces to practice, alone or jointly with others, in the course of performing work for Customer under this Agreement or as a result of that work, whether or not they are eligible for legal protection; and

    b)  any and all property rights (including without limitation all copyrights, patents, trade secrets, moral rights, and other property rights) in and to any and all of the property described in clause (a) above.

Subject to the payment by Customer of all amounts owed to Provider under this Agreement, Provider hereby assigns to Customer all right, title, and interest in and to all Developed Property, including without limitation the right to secure patent, copyright, and other property rights throughout the world, the right to have and to hold such patent, copyright, and other property rights in perpetuity, and the right to claim priority under any relevant laws, regulations, treaties, or conventions, regardless of whether such Developed Property is deemed "works make for hire" pursuant to the United States Copyright Act or other applicable copyright laws.  In any event, the parties hereby agree that, subject to the payment by Customer of all amounts owing to Provider under this Agreement, all original works of authorship created by Provider which constitute Developed Property shall, to the extent legally permissible, constitute "works made for hire" (and Customer shall be considered the "author" thereof) pursuant to the United States Copyright Act and other applicable copyright laws, as the same may be modified from time to time.  Provider hereby represents and warrants to Customer that Provider has full authority and unrestricted right to assign to Customer all Developed Property without incurring legal liability to others.  Upon Customer's request, Provider shall execute and deliver to Customer all instruments and other documents, and shall take such other actions as may be necessary or reasonably requested by Customer, so that Customer may protect and defend its rights in and to such Developed Property.

9.3   <u>Retained Rights of Provider</u>.  Notwithstanding the provisions of Section 9.2 above, Provider shall retain the right to use its general knowledge and experience, as well as any generic development methods, processes, tools, and techniques developed by Provider in the course of performing work for Customer under this Agreement, in connection with other client engagements entered into by Provider and as part of performing services for such other clients, but only to the extent that such items do not constitute, contain, or embody any Customer confidential information as defined in the Section 12 or on behalf of any Customer competitor (as defined in Section 10.2(f) below).  For the avoidance of doubt, Provider agrees and acknowledges that, notwithstanding the foregoing, the workflow, form, calendar-scheduling, KPI and calculator engines that have been developed for Customer by Provider shall be included in Developed Property and Provider shall have no rights in any of the foregoing.



## 10 WARRANTIES

10.1 <u>Mutual Warranties</u>.  Provider and Customer each hereby represents, warrants, and covenants to the other that:

    (a) it has the authority and right to enter into this Agreement and perform its obligations under this Agreement;

    (b) no consent, approval, or withholding of objection is required from any third party or governmental authority with respect to the entering into or the performance of this Agreement; and

    (c) it is under no obligation or restriction, nor will it assume any such obligation or restriction, that will prevent it from performing any of its obligations under this Agreement.

10.2 <u>Provider Representations and Warranties</u>.  Provider hereby represents, warrants, and covenants the following to Customer:

    (a) Each Deliverable shall conform materially to its written specifications for at least sixty (60) days following delivery.  If Customer notifies Provider of a non-conformity during the sixty (60) day period, Provider will, at Customer's option, either promptly remedy the impacted Deliverable(s) or refund to Customer the fees paid for such Deliverable(s).  For the avoidance of doubt, any Deliverable with a quality level (based on both quantitative and qualitative comparisons to prevailing industry standards for software quality assurance and acceptable bug/error rates) of less than the 95th percentile shall automatically be deemed to be non-conforming.

    (b) Provider will perform its obligations in a manner that complies with all applicable laws, regulations, ordinances and codes, including identifying and procuring required permits, certificates, approvals, and inspections.

    (c) Each Provider Representative performing Services has the proper skill, training, and background necessary to accomplish his or her assigned tasks.

    (d) When delivered to Customer, each Deliverable will be free from all known viruses, worms, or other computer codes, the purpose of which are to disable or interrupt the operation of a computer system or destroy, erase, or otherwise harm any data, software, or hardware.

    (e) Neither any Developed Property on a stand-alone basis when delivered to Customer, nor the performance of any Services by Provider, will infringe upon or violate the rights of any third party, but only to the extent the Customer Input did not infringe.

    (f) Provider has not done or permitted to be done, and will not hereafter do or permit to be done, anything that is or may be in any way inconsistent with or that may in any way curtail or impair any right provided to Customer in this Agreement.

    (g) During the term of this Agreement and for a period of three (3) years after its termination, Provider shall not (i) directly or indirectly become, or (ii) directly or indirectly provide services (including but not limited to the development of software applications) for, a competitor of Customer without obtaining Customer's prior written consent, which consent shall be in Customer's sole discretion.  A competitor of Customer is any person or entity:

        I.     Engaging in any supply chain management or supply chain network management services where "supply chain management or network management services" includes any and all services or process steps from the initial development of a product until it is packed, shipped and delivered to the final end user but such limitation being only for the activities related to the development, commercialization, production and logistics required for the end-delivery of the product (including but not limited to any and all



activities that impact the product cost, its quality or the speed at which it is produced and the logistics-chain supporting the delivery of the product to the final consumer)

II. In the 'cut and sew' industry (including but not limited to apparel, footwear, leather goods and accessories, handbags, suitcases, backpacks, outdoor gear, toys, furniture industries and materials used to produce the latter products but not limited to fabric, polyurethane, leather, soles, trims & hardware); and/or

III. Engaging in any manufacturing (steel-based industries excluded) process-related services that provide live shop floor quality, productivity, or speed data. Nonetheless, if Provider has a new business opportunity in the manufacturing space they can request a further exception from Customer, Customer will not unreasonably withhold permission.

10.3 <u>Customer Warranties</u>.  Customer hereby represents, warrants, and covenants the following to Provider:

(a) Customer will perform its obligations in a manner that complies with applicable laws, regulations, ordinances and codes, including identifying and procuring required permits, certificates, approvals, and inspections.

(b) The Customer Inputs provided to Provider will not infringe upon or violate the rights of any third party.

10.4 <u>Limitation on Warranty</u>.  EXCEPT FOR THE WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, EACH PARTY EXCLUDES AND DISCLAIMS ALL WARRANTIES, CONDITIONS OR STATEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY AND / OR FITNESS FOR ANY PARTICULAR PURPOSE.

## 11  INDEMNIFICATION

11.1 <u>Mutual Indemnification</u>.  Subject to the procedures set forth in Section 11.4 below, each party shall, at its expense, defend, indemnify, and hold harmless the other party and its officers and directors, employees, agents, affiliates, successors and assigns from and against any losses, damages, costs, reasonable attorneys' fees, or liabilities (collectively, "Losses") arising from any claim brought against any such indemnified party by any third party alleging injury or death to any person, or damage to or loss of any property, to the extent resulting from the failure of the indemnifying party to comply with its obligations under this Agreement or from the acts or omissions of the indemnifying party or its employees, agents, successors or assigns, whether negligent or otherwise.

11.2 <u>By Provider</u>.  Subject to the procedures set forth in Section 11.4 below, Provider shall, at its expense, defend, indemnify, and hold harmless Customer and its officers and directors, employees, agents, affiliates, successors and assigns from and against any Losses arising from any third-party claim brought against any such indemnified party to the extent alleging that any Developed Property infringes any proprietary right of any third party, including without limitation any copyright, patent, trade name, trademark, or trade secret.  Notwithstanding the above, Provider shall have no liability under this Section 11.2 to the extent that any infringement or claim thereof is based upon:

a) compliance with Inputs provided by Customer, or

b) modifications of such Developed Property by anyone other than Provider where the unmodified version of such Developed Property would not be infringing.

In the event that any Developed Property becomes the subject of a claim of infringement of any proprietary right of any third party, including without limitation any copyright, patent, trade name, trademark, or trade secret, Provider shall, at its choice and expense:



x) procure for Customer a non-exclusive, perpetual, irrevocable, worldwide, fully paid-up, royalty-free license, with the right to sublicense and distribution directly or through its distribution channels, to use, copy, install, perform, display, modify, and create derivative works of such Developed Property for Customer's business purposes and for the business purposes of its affiliates, distributors, customers, successors, and assigns; or

y) replace or modify such Developed Property to make it non-infringing, provided that the replacement or modified Developed Property has the same or additional functionality and comparable or better performance characteristics than the allegedly infringing Developed Property.

11.3 <u>By Customer</u>.  Subject to the procedures set forth in Section 11.4 below, Customer shall, at its expense, defend, indemnify, and hold harmless Provider and its officers and directors, employees, agents, affiliates, successors and assigns from and against any Losses arising from any third-party claim brought against any such indemnified party to the extent alleging that any Customer Input infringes any proprietary right of any third party, including without limitation any copyright, patent, trade name, trademark, or trade secret.  Notwithstanding the above, Customer shall have no liability under this Section 11.3 to the extent that any infringement or claim thereof is based upon:

a) use of a Customer Input in an application or environment for which it was not designed or not contemplated under this Agreement, or

b) modifications of a Customer Input by anyone other than Customer where the unmodified version of such Customer Input would not be infringing.

11.4 <u>Procedure</u>.  For any indemnifiable claim described in this Section 11, an indemnified party shall provide the indemnifying party with prompt written notice (in no event to exceed thirty (30) days after becoming aware of such claim) of any such claim brought against it, together with copies of all related court documents involving such claim.  An indemnified party's failure to provide prompt notice to the indemnifying party of any such claim shall not relieve the indemnifying party from any liability under this Section 11 with respect to such claim, unless the indemnifying party is materially prejudiced by such failure.  The indemnifying party shall, at its sole expense, defend and, at its sole discretion, settle any such indemnifiable claim.  If any compromise or settlement is made with respect to such claim, the indemnifying party shall pay all amounts in settlement of such claim.  The indemnifying party shall keep the indemnified party advised of the status of any such claim and of its defense and/or negotiation efforts.  The indemnified party shall provide the indemnifying party with such information and assistance for the defense of such claim as the indemnifying party reasonably requests.  The indemnified party, at its own expense, shall have the right to participate in the defense of any such claim through counsel of its choosing.  However, the indemnifying party shall have at all times the full and complete authority to defend and settle such claim.

## 12   CONFIDENTIALITY

Information exchanged under this Agreement will be treated as confidential if identified as such at disclosure or if the circumstances of disclosure would reasonably indicate such treatment.  Notwithstanding any failure to so identify or mark it as such, the following categories of Customer's information shall automatically be deemed to be confidential information:

b) discoveries, novel ideas (including, without limitation, ideas relating to new products, new services, or new methods of doing business), developments, designs, improvements, inventions, blueprints, structures, software, systems, content, processes (including technical and business processes), procedures (including technical and business procedures), methods, manuals, computer programs, know-how, data, techniques, formulas, marketing and business plans and outlines, strategies, budgets, forecasts, projections, unpublished financial statements, costs, fee schedules, client and supplier lists, client and prospective client databases, access codes and similar security information and procedures, and all patents, copyrights, mask works, trade secrets, and other proprietary rights thereto;



c) data regarding Customer's and its affiliates' suppliers, vendors, employees, investigators, developers, researchers, investors and business partners;

d) Customer's and its affiliates' costs, expenses, financial position, prices, possible revenues and profit margins; and

e) other processes, systems, software, hardware, designs, plans, strategies and configurations Customer or its affiliates' use or plan to use to conduct its business. Confidential information may only be used for the purpose of fulfilling obligations or exercising rights under this Agreement, and shared with employees, agents or contractors with a need to know such information to support that purpose. Confidential information will be protected using a reasonable degree of care to prevent unauthorized use or disclosure for five (5) years from the date of receipt or (if longer) for such period as the information remains confidential. These obligations do not cover information that:

   I. is or becomes available to the public through no fault of the receiving party;

   II. was known or becomes known to the receiving party without obligation of confidentiality;

   III. is rightfully received by the receiving party from a third party without a duty of confidentiality;

   IV. is independently developed by the receiving party without reference to the confidential information of the disclosing party; or

   V. where disclosure is required by law or a governmental agency.

For the avoidance of doubt, under no circumstances may Provider:

   x) disclose Customer's confidential information (including any Deliverables) to a competitor of Customer (as defined in Section 10.2(f) above) or

   y) disclose or provide access to Customer's confidential information (including any Deliverables) to any client or potential client of Provider, or to any employee or contractor of Provider not directly involved in the development of Deliverables for Customer.

## 13    LIMITATION OF LIABILITY

13.1   EXCEPT FOR LIABILITY ARISING UNDER SECTIONS 10.2(F), 11 OR 12 OF THIS AGREEMENT, NEITHER PARTY SHALL, IN ANY EVENT, REGARDLESS OF THE FORM OF CLAIM, BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, SPECULATIVE OR CONSEQUENTIAL DAMAGES, IRRESPECTIVE OF WHETHER IT HAD AN ADVANCE NOTICE OF THE POSSIBILITY OF ANY SUCH DAMAGES.

13.2   SUBJECT TO SECTION 13.1 ABOVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT, FOR WHATEVER CAUSE OTHER THAN BODILY INJURY OR LIABILITY UNDER SECTIONS 10.2(F), 11 OR 12 OF THIS AGREEMENT, WHETHER IN AN ACTION IN CONTRACT OR IN TORT OR OTHERWISE, WILL BE LIMITED TO GENERAL MONEY DAMAGES AND SHALL IN NO EVENT EXCEED AN AMOUNT EQUAL TO A 3X (THREE TIMES) MULTIPLE OF THE AGGREGATE OF ALL FEES ACTUALLY PAID OR OWING HEREUNDER BY CUSTOMER TO PROVIDER DURING THE 24 MONTHS BEFORE THE EVENT GIVING RISE TO SUCH LOSS, COST, CLAIM OR DAMAGES. THE PARTIES AGREE THAT THE FEES SET FORTH IN THIS AGREEMENT REFLECT THE LIMITATION ON WARRANTIES AND LIABILITY, AND THE ALLOCATION OF RISK, UNDER THIS AGREEMENT.

## 14    TERM AND TERMINATION



14.1 <u>Term</u>.  The term of this Agreement will commence on the date of this Agreement and will continue thereafter for an initial term of five (5) years (the "Initial Term").  After the Initial Term, this Agreement shall be renewed automatically for successive one-year renewal periods unless either party provides written notice of non-renewal at least 180 days (90 days in the case of Customer's notice) prior to the applicable renewal date, and shall continue in force and effect until terminated under the terms of this Section or Section 17.  All terms and conditions hereof shall remain in effect during any renewal term, except as the parties otherwise expressly agree to in writing.

14.2 <u>Termination for Material Breach</u>.  Upon material breach or default under this Agreement or a Statement of Work by any party (the "breaching party"), if the other party ("non-breaching party") gives written notice of such breach or default and the same is not cured within fourteen (14) days after delivery of such notice, then, without limitation of any other remedy available hereunder, the non-breaching party may terminate this Agreement or the applicable Statement of Work by delivery of a written notice of termination at any time thereafter before such breach or default has been cured, and such termination shall be effective as of the date of such subsequent notice.

14.3 <u>Duties Upon Termination; Survival</u>.  In the event of termination hereunder:

    a) Customer shall pay Provider all fees as specified in the Statement of Work and expenses up to the effective date of the termination; and

    b) Provider shall promptly return all copies of Customer property in its possession or control to Customer, including without limitation all Developed Property and Customer Confidential Information.

Termination of this Agreement shall not be construed to waive or release any claim that a party is entitled to assert at the time of such termination, and the applicable provisions of this Agreement shall continue to apply to such claim until it is resolved.  The terms of Sections 9, 10, 11, 12, 13, 16, and 19 shall survive the termination of this Agreement for any reason.

## 15 PUBLICITY

Provider shall have no right to use Customer's name or logo for any purpose except with Customer's prior written consent.  In the event of such consent, Provider will adhere to Customer's guidelines for logo, brand and trademark usage.

## 16 RELATIONSHIP OF PARTIES

Customer and Provider are independent contractors and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between Customer and Provider.  Neither Customer nor Provider will have the power to bind the other or incur obligations on the other party's behalf.   During the performance of services under this Agreement, Provider's employees will not be considered employees of Customer for any purpose whatsoever.  Accordingly, Provider shall be solely responsible for the compensation of such employees, including employment-related taxes.

## 17 FORCE MAJEURE

Neither party shall be in default if failure to perform any obligation hereunder (except for any payment obligations) to the extent caused by events or conditions beyond that party's reasonable control, such as an act of God, fire, casualty, flood, war, strike, lock out, failure of public utilities, injunction or any act, exercise, assertion or requirement of any governmental authority, epidemic, destruction of production facilities, insurrection, inability to obtain labor, materials, equipment, transportation or energy sufficient to meet needs (a "Force Majeure Event"), in each case so long as such failure to perform could not have been prevented by reasonable precautions.  Either party reserves the right to terminate this Agreement or any Statement of Work hereunder in the event a Force Majeure Event



prevents the other party from providing the Services or performing any other obligations under this Agreement for a period of fourteen (14) days.

## 18    DISPUTE RESOLUTION

18.1    Good Faith Negotiation.  All controversies or claims arising out of or relating to this Agreement shall be resolved in accordance with the terms and conditions set forth in this Section.  First, the disputing party shall give the other party written notice (the "Notice") of the controversy or claim in accordance with the notice provision of this Agreement.  The parties will attempt in good faith to resolve each controversy or claim within thirty (30) days from the delivery of the Notice by negotiations between senior executives of the parties who have settlement authority and who do not have direct responsibility for the administration of this Agreement.  The other party shall submit a response within ten (10) days after receiving such Notice.  The Notice and response shall include

a)  a summary of the party's position and a summary of the evidence and arguments supporting its position, and

b)  the name of the executive who will represent the party.

The executives shall then meet at a mutually acceptable time, either telephonically or in person, within twenty (20) days of delivery of the disputing party's Notice and thereafter as often as they deem reasonably necessary to resolve the controversy or claim.  Customer and Provider agree that all negotiations conducted pursuant to this Section are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.  If the controversy or claim has not been resolved within thirty (30) days of delivery of the disputing party's Notice, then either party may submit the dispute or controversy to the court of exclusive jurisdiction as set forth in Section 18.2 below.

18.2    Dispute Resolution.  All disputes and litigation arising under or relating to this Agreement which cannot be resolved pursuant to Section 18.1 above shall be subject to the exclusive jurisdiction of the federal courts sitting in New York, NY.  The parties hereby irrevocably submit to the personal jurisdiction of such courts and irrevocably waive all objections to such venue.

18.3    Equitable Relief.  Nothing herein shall preclude either party from seeking and obtaining from a court of competent jurisdiction appropriate equitable relief, including without limitation, a temporary restraining order or other injunctive relief, to prevent a breach of this Agreement relating to Sections 9 (Intellectual Property), 12 (Confidentiality), or to otherwise maintain the status quo pending outcome of any arbitration.

## 19    MISCELLANEOUS

19.1    Governing Law.  This Agreement shall be governed by, subject to, and interpreted in accordance with the laws of the State of New York, U.S.A., without regard to conflict of laws principles.  The parties agree that this Agreement shall not be governed by the 1980 U.N. Convention on Contracts for the International Sale of Goods and that English is the governing language of this Agreement.

19.2    Assignment.  Provider may not assign or subcontract this Agreement or any of its rights or obligations hereunder without the express written consent of Customer.  Any attempt by Provider to assign or transfer any of its rights or obligations under this Agreement in violation of this Subsection shall be considered void and shall be deemed a material breach of this Agreement.  Subject to the foregoing, this Agreement will be fully binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

19.3    Waiver and Severability.  Failure to enforce any term or condition of this Agreement shall not be deemed a waiver of the right to later enforce such term or condition or any other term or condition of this Agreement.  If any provision of this Agreement is found to be void or unenforceable, that provision



will be enforced to the maximum extent possible, and the remaining provisions of this Agreement will remain in full force and effect.

19.4    Entire Agreement.  This Agreement (and the Exhibits attached hereto), together with the Statements of Work, contain the entire agreement and understanding between Customer and Provider with respect to the subject matter hereof and supersede all prior agreements, negotiations, representations, and proposals, written and oral, relating to the subject matter.  All Exhibits and all other documents, when agreed to by the parties and attached hereto, are integral to and incorporated herein by this reference.

19.5    Amendments.  This Agreement and the Exhibits attached hereto shall not be deemed or construed to be modified, amended, or waived, in whole or in part, except as set forth herein or by a separate written agreement duly executed by the parties to this Agreement.  No pre-printed purchase order, invoice, or other document which purports to alter or amend the printed text of this Agreement shall alter or amend any provision of this Agreement or otherwise control, unless Customer and Provider both specify in writing that such pre-printed terms or conditions shall control.

19.6    Notices.  All notices required hereunder shall be sent to the parties at their address as set forth below. The addresses of the parties may be revised from time to time, in which event each party shall so notify the other, in writing.  All such notices shall be given by personal delivery (including reputable courier service), fees prepaid, or by sending such notice by registered or certified mail return receipt requested, postage prepaid, and addressed as set forth below.  Such notices shall be deemed to have been given and delivered upon receipt or attempted delivery (if receipt is refused), as the case may be, and the date of receipt identified by the applicable governmental postal service on any return receipt card shall be conclusive evidence of receipt.  Notices also may be sent by email transmission, which shall be deemed received when transmitted so long as no 'could not deliver' response is received.

If to Provider:

High Peak Software, Inc.
6055 Southard Trace
Cumming, GA 30040
U.S.A.
Attn:  vinay@highpeaksw.com

If to Customer:

Impactiva S. de R.L.
Torre Banco General, piso 21
Calle Aquilino de la Guardia
Panama City, Panama
Attn:  legal@impactiva.com and jsuarez@impactiva.com

19.7    Interpretation.  This Agreement is the result of negotiations between the parties and is being signed after consultation by the parties with their respective legal counsel.  This Agreement will not be construed in favor of or against any party by reason of the extent to which any party participated in the preparation of this Agreement.  The term "including" means by way of example and not of limitation.  All references the term "days" shall, unless otherwise specified herein, mean calendar days.  The section and subsection headings used in this Agreement are for the convenience of the parties only and shall not be deemed a part of or utilized in interpreting this Agreement.  This Agreement may be executed electronically (only taking effect once both parties have signed) and in any number of counterparts, all of which taken together will constitute one single agreement between the parties.

19.8    Non-Solicitation / Non-Hire. During this Agreement and for a period of two (2) years following the termination of this Agreement, Provider and Customer will not directly or indirectly solicit any of the



other party's employees or contractors to leave their employment or consulting engagement or hire any of the other's such personnel.  Notwithstanding the foregoing, the parties agree that Customer without being considered to have breached this Section 19.8, during the period starting one (1) year from the Effective Date, shall have the right to solicit for employment or a consulting engagement of up to two (2) of Provider's Sr. Software Developers (one that has worked on the back-end and one on the front-end) in exchange for two (2) months compensation to be paid by Customer to Provider as per the monthly rate defined in Exhibit B for these positions.

*[Signature page follows]*



IN WITNESS WHEREOF, the parties hereto, each acting under due and proper authority, have executed this Agreement as of the day, month and year first above written.

**IMPACTIVA S. DE R.L.**

**HIGH PEAK SOFTWARE, INC.**

By _____

Jose R. Suarez

Print Name

Administrator

Title

By _____

Vinay Chandra

Print Name

CEO

Title

**Attachments:**
Exhibit A – Form of Statement of Work
Exhibit B – Provider Billing Rates



**EXHIBIT A**

**FORM OF STATEMENT OF WORK**

This Statement of Work is made effective as of _____ __, 20__ by and between Impactiva S. de R.L. a limited liability company organized under the laws of the Republic of Panama ("Customer"), and High Peak Software, Inc., a Delaware corporation ("Provider"), and pertains to and is made a part of the Master Services Agreement executed between Customer and Provider as of November __, 2018 (the "Agreement"). All undefined capitalized terms herein shall have the meanings ascribed to such terms as set forth in the Agreement.

[a] Technical Terms:

   SECTION  CONTENTS

    1)     INTRODUCTION
    2)     PROJECT SCOPE
    3)     ENVIRONMENT
    4)     DEVELOPMENT/IMPLEMENTATION STRATEGIES
    5)     TESTING AND VALIDATION
    6)     PROJECT ORGANIZATION, MANAGEMENT, AND QUALITY ASSURANCE
    7)     ACCEPTANCE CRITERIA AND PROCEDURES – SCHEDULE 1
    8)     DELIVERABLES – SCHEDULE 2
    9)     SPECIFICATIONS - SCHEDULE 3
    10)    IMPLEMENTATION PLAN - SCHEDULE 4
    11)    MILESTONES AND SCHEDULES - SCHEDULE 5
    12)    OTHER PROJECT RELATED ITEMS

[b] Commercial Terms:

   SECTION CONTENTS

   1. FEE STRUCTURE AND PAYMENT TERMS – SCHEDULE 6
   2. OTHER COMMERCIAL ITEMS

IN WITNESS WHEREOF, the parties hereto, each acting under due and proper authority, have executed this Statement of Work as of the day, month and year first above written.



**IMPACTIVA S. DE R.L.**                  **HIGH PEAK SOFTWARE, INC.**

By_____     By_____

_____     _____
Print Name                               Print Name

_____     _____
Title                                    Title



**SCHEDULE 1**

**ACCEPTANCE CRITERIA AND PROCEDURES**

Specify acceptance criteria that will be utilized to determine the acceptability of the Deliverables under this Statement of Work:

Test plans prepared by Provider and submitted to Customer
Test cases prepared by Provider and submitted to Customer
Execution of test cases and scripts to Customer's reasonable satisfaction
Test summary report prepared by Provider and submitted to Customer
Customer confirms in writing that the Deliverables meet all agreed specifications
_____
_____


**SCHEDULE 2**

**DELIVERABLES**

Specify the Deliverables under this Statement of Work:
_____
_____


**SCHEDULE 3**

**SPECIFICATIONS**

Specify the functional and technical requirements, operations, and procedures for each Deliverable under this Statement of Work:
_____
_____


**SCHEDULE 4**

**IMPLEMENTATION PLAN**

Specify the implementation plan and methodologies for this Statement of Work:
_____
_____


**SCHEDULE 5**

**MILESTONES AND SCHEDULES**

Specify the milestones and schedules for this Statement of Work:
_____
_____



**SCHEDULE 6**

**FEE STRUCTURE AND PAYMENT TERMS**

Specify the fee structure and payment terms for this Statement of Work:
_____
_____



**EXHIBIT B**

**PROVIDER BILLING RATES**

## Team in Bangalore, India

| Role | Year of Experience | Level | USD Per Hour Rate | USD Per Month Rate |
|---|---|---|---|---|
| Technical PM | 5+ | PM | 30.00 | 4,800 |
| Architect | 5+ | Arch | 35.00 | 5,600 |
| Backend Dev L4 | 5+ | L4 | 30.00 | 4,800 |
| Backend Dev L3 | 3-5 | L3 | 25.00 | 4,000 |
| Backend Dev L2 | 1.5-3 | L2 | 15.00 | 2,400 |
| Frontend Dev L3 | 3-5 | L3 | 25.00 | 4,000 |
| Frontend Dev L2 | 1.5-3 | L2 | 15.00 | 2,400 |
| QA L3 | 3-5 | QL3 | 15.00 | 2,400 |
| QA L2 | 2-3 | QL2 | 10.00 | 1,600 |
| Designer | 2+ | Designer | 30.00 | 4,800 |
| DevOps | 2-4 | DevOps | 20.00 | 3,200 |
| Data Scientist | 2+ | L2 | 20.00 | 3,200 |
| Scrum Master | 2-4 | L3 | 25.00 | 4,000 |

| Estimated Hours / Month | 160 |
|---|---|

