UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VAESO, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>HIGH PEAK SOFTWARE, INC.,<br><br>*Defendant*.<br><br>HIGH PEAK SOFTWARE, INC.,<br><br>*Counterclaim Plaintiff*,<br><br>v.<br><br>VAESO, INC. and IMPACTIVA S. DE R.L.,<br><br>*Counterclaim Defendants*. | Civil Action No. 1:22-cv- 01220-PAE |

### DEFENDANT HIGH PEAK SOFTWARE INC.'S RESPONSE TO VAESO, INC. AND IMPACTIVA S. DE R.L. INTERROGATORIES DATED APRIL 15, 2022

COMES NOW High Peak Software Inc. (hereinafter "Defendant" or "HPS"), by and through the undersigned counsel and respond to Vaeso, Inc. and Impactiva S. DE R.L. Interrogatories Dated April 15, 2022, as follows:

### PRELIMINARY STATEMENT

(a)     The following responses and objections to Vaeso, Inc. and Impactiva S. DE R.L. Interrogatories Dated April 15, 2022, are based upon information presently available to Defendant, which Defendant believes to be correct. These responses are made without prejudice to Defendant's

1

right to use any facts or documents which may be discovered subsequent to the date on which these responses are being served. Responses to these interrogatories may be supplemented upon Defendant's further investigation and acquisition of information or documents which Defendant either does not possess or cannot locate or access at this time. However, any such further supplementation will be made only as may be required by law. These responses are neither intended as, nor shall in any way be deemed, an admission or representation that further information or documents exist.

(b)     This response is subject to, does not waive or intend to waive, and preserves and reserves all rights under the Federal Rules of Evidence, including the right to object to any other discovery procedures involving or relating to the subject matter of these interrogatories. This response shall not constitute a waiver of Defendant's right to file dispositive motions with the Court.

(c)     No incidental or implied admissions of fact by Defendant is made by the responses below. The fact that Defendant has answered any interrogatories herein may not properly be taken as an admission that they accept or admit the existence of any fact set forth or assumed by such interrogatory, or that such response constitutes admissible evidence. The fact that Defendant has answered part of all of any interrogatory is not intended to and shall not be construed to be a waiver by Defendant of all of any part of any objection to any interrogatory made by it.

(d)     This Preliminary Statement is incorporated into each of the responses set forth below.

## GENERAL OBJECTIONS

1.     These General Objections are incorporated into each of the responses set forth below.

2.     Defendant objects to any interrogatory that seeks to require Defendant to comply with requirements beyond the scope of the Federal Rules of Evidence

3.     Defendant objects to any interrogatory that calls for information or documents not within its possession, custody, or control.

4. Defendant objects to any interrogatory that calls for privileged information or documents protected by the attorney/client privilege, work product doctrine, or any other applicable privilege or protection.

5. Defendant objects to any interrogatory that calls for information that is a trade secret or confidential pursuant to applicable law and/or protected trade and business data and other non-public confidential information which is proprietary to Defendant.

6. A reference to Vaeso herein shall also constitute a reference to Impactiva and vice versa.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Identify the services to be provided by HPS to VAĒSO and/or Impactiva, describing how the same changed over time.

**High Peak Software Inc. Response to Interrogatory No. 1:** Defendant incorporates its general objections as if set forth herein. Defendant further objects to the extent this request is overly broad and unduly burdensome. Subject to and without waiving said objections, Defendant responds as follows:

HPS commenced providing software development services. HPS' provision of services increased and HPS undertook additional responsibilities to assist Vaeso scale its projects. The services are listed the below:

|   | HP Services Category | HP Services Details | Initial Scope | Revised Scope |
|---|---|---|---|---|
| 1 | Application Discovery - Solution Architecture | Working with the Product Owner to work on the solution and understanding the feasibility of it | x | x |
| 2 | Architecture | Data Architecture | x | x |
| 3 | Architecture | Platform/Application Architecture | x | x |
| 4 | Design - Wireframes | Creation of wireframes from the defined product features | x | x |

3

| # | | | | |
|---|---|---|---|---|
| 5 | Design - High Fidelity | Creation of the high fidelity designs after approval of the wireframes by the product manager | x | x |
| 6 | Software Development - Frontend Webapp | Building of the Webapp application on the browser of the tablet | x | x |
| 7 | Software Development - Backend Webapp | Building the application on the server which helps store the data and the data crunching | x | x |
| 8 | Software Development - Mobile App | Design and implementation of an Android Mobile Application to sit on the tablet which was chosen for use in the factory. | | x |
| 9 | IoT Development | Design and implementation of Raspberry Pi based architecture to drive factory based iot systems like monitors and machine sensors. | | x |
| 10 | Software Testing - Manual | HPS testing team carried out manual testing of newly developed features to ensure a quick implementation of the software. | x | x |
| 11 | Software Testing - Automation | HPS Testing team created hundreds of test cases and automated the testing of the software that was created to ensure a bug free operation. | x | x |
| 12 | DevOps - Manual | The HPS Devops team was responsible for successfully deploying the software in numerous factories around the world and ensuring that the software worked seamlessly on the factory shopfloor. | x | x |
| 13 | DevOps - CI/CD | The HPS devops team created an automated process to ensure that developed software was continuously deployed without a lot of manual intervention. | x | x |
| 14 | Factory Network Architecture | HPS personnel worked on designing the physical network architecture for the factories from scratch and were instrumental in ensuring a seamless implementation | | x |
| 15 | Technology Knowledge | AI-ML, Data Science in visual-numerical- text, Security Audits-Access, IoT (MQTT Modbus protocols to connect to robots/PLC systems) | | x |
| 16 | Technology Knowledge | Vision AI defect detection, Automated Garment Measurement using images | | x |
| 17 | Recruiting | HPS provided technical interviewing manpower | | x |
| 18 | Recruiting | Hire Freshers, QA, and qualified technical personnel. At the end of Sep 2021 HPS provided 13 people to Vaeso after onboarding and training them for approximately 6 months. | | x |

| | | | | |
|---|---|---|---|---|
| 19 | Onboarding of personnel | The HPS HR team onboarded the hired employees on behalf of Vaeso | | x |
| 20 | Fresher 0-12 Month Learning | HPS defined the Fresher Learning Process and ensured that the learning plan was implemented and followed. | | x |
| 21 | Talent Management | The HPS team fostered and maintained relationships with all its team members on the Vaeso project in spite of the virtual mode of working through the pandemic. | x | x |
| 22 | Talent Management | The HPS team created and rolled out benefit plans to ensure that the team was being competitively compensated. | x | x |
| 23 | Talent Management | HPS provided additional Technical and non-technical Resources when Vaēso had an urgent shortfall and needed to meet urgent customer deadlines. | | x |
| 24 | Talent Management | Logistics: visit to Factories for post implementation support and for pre-implementation assessment | | x |
| 25 | Infrastructure | Remote Working setup: VPN, broadband, equipment as required for the tech team | x | x |
| 26 | Infrastructure | In Office Working: Hybrid remote-office work schedules were setup and implemented | x | x |
| 27 | Infrastructure | HPS personnel managed Vaeso Assets by ordering, storing, and managing the logistics during factory implementations. | | x |
| 28 | BD Support | HPS personnel supported Customer Demos; Data loading and Walkthroughs. | x | x |
| 29 | BD Support | HPS team provided estimates for customer requested Customizations and also provided Cost Proposals for Support features. | | x |
| 30 | Product Management | Scenario discussions, BA, Wireframing, UX design, Marketing Deck Support; Collaborate between Multiple Stakeholders; Manage and resolve conflicts | x | x |
| 31 | Product Management | Product Backlog Grooming and Prioritization | x | x |
| 32 | Product Management | Support Product Documentation collaboration with Learn Team for features developed by HP team | | x |
| 33 | Project Delivery | Roadmap and Sprint Planning for products/ product features developed by HP team | x | x |
| 34 | Project Delivery | Project Management using Agile methodologies of products/ product features developed by HP team | x | x |

| | | | | |
|---|---|---|---|---|
| 35 | Project Delivery | Project Delivery Process and continuous improvement initiatives, Deployments of products/ product features developed by HP team | x | x |
| 36 | Project Delivery | Test Automation covering multiple factories business use cases for features developed by HP team | x | x |
| 37 | Project Delivery | Feature integration into the platform and delivery (with multiple scrum teams) | x | x |
| 38 | Production Support | Level 2 and above production support of products/ product features developed by HP team | | x |
| 39 | Production Support | New Factory setup | | x |
| 40 | Production Support | Asset + Application monitoring | | x |
| 41 | Strategy | Value additions to overall Vaeso way-forward strategy by senior HP team members | | x |
| 42 | Strategy | Technical Brainstorming to improve the application beyond app development | x | x |
| 43 | HP Work Culture | To get work done to succeed regardless of the number of hours spent per day. Very high unpaid overtime; Low attrition despite having no work-life balance; showcases commitment and ownership of the HPS team. | x | x |
| 44 | HP Work Culture | Work on varied tasks on behalf of Vaeso | x | x |
| 45 | Vendor Management and Evaluation | HP worked with vendors and evaluated them for the factories | | x |
| 46 | Sourcing support | Since Vaeso did not have an India entity HPS all material imports were done in HPS's name. HPS personnel were involved in clearing Customs and managing other administrative formalities. | | x |
| 47 | Application/Process Security | HPS personnel provided the expertise for ISO27001 certification process setup and helped enable audits and subsequent approvals. | | x |
| 48 | Customer Audits | HPS personnel were instrumental in managing customer audits and ensuring subsequent approvals. Customers like Nike and Decathalon had extensive audit formalities which were understood, managed, and successfully answered by HPS. | | |

**INTERROGATORY NO. 2:** Identify the fees to be charged for services to be provided by HPS to VAĒSO and/or Impactiva, describing how the same changed over time.

**High Peak Software Inc. Response to Interrogatory No. 2:** Defendant incorporates its general objections as if set forth herein. Subject to and without waiving said objections, Defendant responds as follows:

HPS signed a MSA with Impactiva to develop the product on a time and material basis in August 2018. In or about April 2019, the parties agreed that HPS' time and material provision of services would be a cost based model whereby HPS agreed to invoice and receive payment for its costs in providing the services in exchange for Vaeso's agreement to compensate HPS for the difference between the MSA Exhibit B rates and the Cost based billing models. The agreement was that Vaeso would compensate HPS for the lost profit that HPS was foregoing by providing HPS with equity equivalent to the profits HPS forewent.

HPS further responds that documents from which the answers to Interrogatory No. 2 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

**INTERROGATORY NO. 3:** Identify complaints by VAĒSO or Impactiva concerning the work product of HPS and how the same were identified and addressed.

**High Peak Software Inc. Response to Interrogatory No. 3:** Defendant incorporates its general objections as if set forth herein. Subject to and without waiving said objections, Defendant responds as follows:

The application that HPS built for Vaeso was complex and provided a solution that did not exist in the market. At the commencement of HPS provision of services, HPS was provided with an initial excel spreadsheet that Vaeso indicated was the Shop Floor Live Control (SFLC) Business Analysis & Design; "DS205.01 SFLC Business Analysis & Design V18 2018.07.05". Thereafter, during the course of HPS provision of services pursuant to the MSA, the scope of what Vaeso requested and required from HPS grew exponentially. Over the course of the next 3.5 years while the actual

applications were developed, Vaeso's requirements increase in both scope and complexity. An Enterprise software suite of this complexity inevitably has issues that develop as the requirements' scope and complexity increase as occurred regarding the application in this case, especially as Vaeso intended the suite of application to exist on the factory floor on a physical server and consist of a factory floor system utilizing a wireless network and proprietary Android tablets with a custom mobile application, as opposed to a SAAS product with a web application. The interplay of this complex software and hardware ecosystem on a factory floor used by non-technical increases the number of issues that must be addressed. Ultimately, HPS successfully deployed the suite in multiple factories in India, Vietnam, China, and Portugal. As and when issues arose, HPS was able to perform proper root cause analysis and provide fixes to these solve the issues.

HPS further responds that documents from which the answers to Interrogatory No. 3 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

**INTERROGATORY NO. 4:** Identify any product errors that HPS was aware of but unable to fix.

**High Peak Software Inc. Response to Interrogatory No. 4:** Defendant incorporates its general objections as if set forth herein. Defendant further objects to the extent this request vague and ambiguous. Subject to and without waiving said objections, Defendant responds as follows:

The software suite that the HPS team built over 3.5 years was extremely complex and continuously evolving both in terms of technology as well as features. In the development of complex software for complex factory environments where the interplay of multiple variables is high, issues are not uncommon and have to be remediated. As and when issues arose, HPS was able to perform proper root cause analysis and provide fixes to these solve the issues.

In such a complex product, there were minor issues which the HPS team was not able to remediate prior to the termination of the MSA. These issues occurred where Vaeso required new features be delivered within an unreasonable timeline or where the other more important development

matters demanded by Vaeso required HPS to prioritize other tasks or features and deprioritize the initial identified issue. In addition, during the 3.5 years of development, Vaeso's scope and requirements continually changed to such an extent that many of the initially identified issues would require a change in software architecture and it made more practical sense to simply develop a work-around. Some identified issues were extremely minor or simply not reproducible or replicable in the development environments, such that Vaeso and HPS agreed to defer remedial action until such time as the development team could make such issues a priority. Ultimately, HPS successfully deployed the suite in multiple factories in India, Vietnam, China, and Portugal.

HPS further responds that documents from which the answers to Interrogatory No. 4 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

**INTERROGATORY NO. 5:** **Explain the circumstances when HPS locked VAĒSO out of its computer servers.**

**High Peak Software Inc. Response to Interrogatory No. 5:** Defendant incorporates its general objections as if set forth herein. Subject to and without waiving said objections, Defendant responds as follows:

HPS never locked Vaeso out of the computer servers. Vaeso requested termination of the MSA on or about October 3, 2021. From the time of Vaeso's termination request, HPS provided more than 3 months of support instead of the contractual term of 1 month provided in the MSA. HPS sent multiple documented notifications that HPS would no longer be providing services under the MSA. HPS ignored HPS' notifications and continually failed to pay HPS invoices on a timely basis. Upon Vaeso's non-payment of HPS invoices, HPS again notified Vaeso that employees would be moved off of the project if Vaeso did not address its non-payment promptly. Despite HPS' multiple notifications that it would cease providing services and would move its employees to alternative projects, during this time period Vaeso made no attempt to obtain knowledge transfer or obtain access

to the servers. Even after the HPS' legal counsel sent final notice to Vaeso on January 14, 2022, Vaeso made no efforts or arrangements to transition the project from HPS.

Subsequent to January 21, 2022, the date identified by HPS that it would transition the entire team from the project, Hemanth Ramakrishnaiah, Vaeso's Project Lead, contacted Manjunath Gowda, HPS DevOps employee, via Whatsapp on Jan 30, 2022.



On the date Vaeso's Project Lead sent the Whatsapp message, Mr. Gowda was on leave from work due to his upcoming wedding. Mr. Ramakrishnaiah escalated this issue to HPS' Management team on January 31, 2022. Mr. Gowda responded immediately and got on a call that same day to resolve Vaeso's concern. Vaeso's allegation that HPS "locked" Vaeso out of its servers is inaccurate. Moreover, once HPS became aware of Vaeso's concern on January 31, 2022, HPS responded within a reasonable timeframe and was able to provide all the necessary details for Vaeso to gain access.

10

Documents evidencing the above include: (1) Hemanth Ramakrishnaiah email dated January 31, 2022 @ 1:29 am providing notice to HPS; (2) Manjunath's email in response dated January 31, 2022 @ 9:26 am providing the Vaeso factory credentials through a share point link; (3) Manjunath's email dated January 31, 2022 @ 5:01 pm providing the Vaeso factory credentials through a google docs link; (3) Mr. Ramakrishnaiah's email dated February 1, 2022 @ 1:41 pm identifying the access issues; (4) Manjunath's email dated February 1, 2022 @ 4:40 pm to Mr. Ramakrishnaiah and other Vaes operons indicating that "[a]ll the credentials has been shared.  We can definitely get into a call and I can address the issues if any;" (5) Mr. Ramakrishnaiah's response email dated February 1, 2022 @ 4:53 pm; and (5) Manjunath's email dated February 2, 2022 @ 7:48 am providing further information. HPS further responds that documents from which the answers to Interrogatory No. 4 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

**INTERROGATORY NO. 6:** **Explain how either VAĒSO or Impactiva is indebted to Defendant in the amount of $283,294, as set forth in paragraph 14 of the Answer with Counterclaims and Third-Party claims.**

**High Peak Software Inc. Response to Interrogatory No. 6:** Defendant incorporates its general objections as if set forth herein. Subject to and without waiving said objections, Defendant responds as follows:

Both Vaeso and Impactiva are indebted to HPS. As of November 30, 2021, the balance pending to HPS based on all the invoices provided at HPS' cost for the employees, reimbursable expense invoices and overhead charges from August 2018 to November 2021 is $283,294.09. HPS notified Vaeso that "at Cost" rates would be applicable until November 2021, as Vaeso's termination of the relationship and HPS' obligations to provide services ended October 1, 2021, with an additional 30 day period permitted based on HPS' good faith. The total amount invoiced at cost was $2,002,872.33. The total amount received as of November 30, 2021, was $1,719,578.24. The remaining balance as of November 30, 2021, was $283,294.09.

HPS further responds that documents from which the answers to Interrogatory No. 6 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

**INTERROGATORY NO. 7:** **Explain how either VAĒSO or Impactiva is indebted to Defendant in the amount of $2,126,173, as set forth in paragraph 41 of the Answer with Counterclaims and Third-Party claims.**

**<u>High Peak Software Inc. Response to Interrogatory No. 7:</u>** Defendant incorporates its general objections as if set forth herein. Defendant further objects to the extent this request is overly broad and unduly burdensome. Subject to and without waiving said objections, Defendant responds as follows:

HPS and Impactiva agreed that HPS would provide services based on the MSA's Exhibit B commencing August 2018. As described in the counterclaim, in April 2019, HPS and Impactiva agreed to move to "at-cost" in exchange for equity to be provided in Vaeso for profit HPS was foregoing in the provision of services pursuant to the MSA and its Exhibit B rates. Numerous emails were sent by HPS to Vaeso's principal Jose Suarez between August 2018 and January 2022 specifying the accrual of HPS foregone profit for providing the services under the MSA. These documents are produced contemporaneously herewith. Vaeso never transferred the equivalent equity in Vaeso to HPS as the parties had agreed. Accordingly, HPS seeks the foregone profit accrued from August 2018 through January 2022 and maintains a claim to the Developed Property under the MSA given that as a result of the non-payment no rights in the Developed Property have vested in Impactiva or Vaeso. The total billable amount along with balances is: (a) Total MSA invoiced amount: $3,933,120.47; (b) Total amount Received by HPS as of February 1, 2022: $1,806,947.79; (c) Outstanding balance as of February 1, 2022: $2,126,172.68. The attached spreadsheet is incorporated by reference.

HPS further responds that documents from which the answers to Interrogatory No. 7 can be derived are being contemporaneously produced herewith pursuant to F.R.C.P. 34.

Respectfully submitted this 23rd day of May 2022.

**LISTON ABRAMSON LLP**

 /s/  *Alex G. Patchen*
David G. Liston
Alex G. Patchen
The Chrysler Building
405 Lexington Ave, 46th Floor
New York, NY 10174
Tel: (212) 257-1630
Email: david.liston@listonabramson.com
Email: alex.patchen@listonabramson.com


**PETER F. SCHOENTHALER, P.C.**

 /s/  *Peter F. Schoenthaler*
Peter F. Schoenthaler, Esq.
*Admitted Pro Hac Vice*
Christopher Rosser, Esq.
*Admitted Pro Hac Vice*
3200 Windy Hill Road, SE
Suite 1600E
Atlanta, Georgia 30339
Tel: (404) 592-5397
Fax: (855) 283-8983
pfs@schoenthalerlaw.com
crosser@schoenthalerlaw.com
*Attorneys for Defendant and Counterclaim Plaintiff High Peak Software, Inc.*